***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments of the parties. The defendant has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** *Page 2 
As set forth in the Pre-Trial Agreement and Deputy Commissioner Phillips' July 14, 2010 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Is defendant subject to the Act and the jurisdiction of the North Carolina Industrial Commission?
2. Was plaintiff an employee of defendant at the time of the accident?
3. Did plaintiff sustain a compensable injury by accident and if so, to what benefits is plaintiff entitled?
4. Should plaintiff's claim against defendant be dismissed due to the contention that defendant is an owner of property, not a general contractor?
5. Whether any penalties should be assessed for defendant's failure to provide workers' compensation insurance as required by the Act?
6. What is plaintiff's average weekly wage?
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The date of the alleged injury is November 25, 2006.
2. The nature of the alleged injury is a cervical and head injury.
3. Plaintiff claims compensation for temporary total disability, temporary partial disability, permanent partial disability, and medical treatment.
4. Defendant does not presently employ plaintiff.
 *********** *Page 3 
The following documentary evidence was received as:
 EXHIBITS
1. Stip. Ex. #1: Medical Records, IC Forms, Discovery Responses
2. Defendant's Ex. #1: Timesheet
3. Defendant's Ex. #2: Timesheet
4. Defendant's Ex. #3: Timesheet
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was fifty-one (51) years old. Plaintiff met defendant, Diane Watkins, through a friend who was working for defendant as a general contractor. Plaintiff was seeking work as a framer to perform restoration on houses. Defendant was not in the construction business. Defendant does not hold a general contractor's license. Defendant did not hold herself out as a landlord or as being engaged in the home renovation business.
2. Defendant is a registered nurse. Defendant owns five (5) mill houses in Cramerton, North Carolina, including the house at 112 Seventh Avenue in Cramerton, North Carolina. Defendant uses the houses mainly to allow family members to occupy them rent free; specifically her mother and father who are separated. Defendant has rented at least one of these houses during the period between 2006 and 2010. Defendant also has these houses up for sale and has sold at least one of these houses. *Page 4 
3. Plaintiff first met defendant in September of 2006. Eddie Bingham, a general contractor working for defendant, informed plaintiff that defendant needed help. Plaintiff had previously worked for Bingham. Plaintiff and his wife met with defendant to discuss employment and pay.
4. Plaintiff's understanding was that defendant was remodeling houses for rent, and that workers would proceed from one house to another, performing various types of work. It was plaintiff's understanding that he was to be paid every Friday at 4:00 p.m., and was to be paid at the rate of $30.00 per hour instead of working for a fixed sum. Plaintiff understood he would work forty (40) hours per week. It was also his understanding that he was to submit time slips in order to be paid.
5. The Full Commission finds, based upon the greater weight of the evidence, that defendant did not enter into a contract to repair the house on the 112 Seventh Avenue property for someone else, but rather, was repairing the house for herself, as the owner of the property, with the intention to sell or rent the house upon its completion.
6. Mr. Bingham or other contractors that defendant used for renovation would typically provide their own tools. Defendant had accumulated some tools during the renovation process and would lend those tools on occasion. If there was a tool that someone needed, defendant would purchase the tool and dock that contractor's pay. Defendant furnished chop saws, skill saws, miter boxes, and related equipment. Plaintiff used his own hammer and tool bag. Defendant bought all materials and supplies.
7. Plaintiff was not permitted to hire any assistants. All of the hiring went through defendant. Defendant inspected plaintiff's work daily. Plaintiff understood that defendant had the right to control the details of plaintiff's work, to inspect his work, and to reject his work. On a *Page 5 
few occasions, defendant rejected work on some closets, construction on a deck, as well as work on a duct wrap.
8. The Full Commission finds, based upon the greater weight of the evidence, that defendant was neither a principal contractor nor a sub-contractor in the construction on the 112 Seventh Avenue property, but was the owner/builder of the house at 112 Seventh Avenue.
9. Defendant testified that Eddie Bingham informed her that he had a crew that could work on her houses. Mr. Bingham presented himself as a general contractor who had employees working for him. Defendant testified that Bingham set his own hours and oversaw the majority of the work. Defendant testified that the control of the details of the work was left up to Bingham.
10. Defendant further testified that Bingham became dishonest and that is when defendant took over payment of Bingham's crew. Defendant was informed by one of Bingham's crew that he had not been paid for the first week of work and defendant had already given Bingham the funds to pay that employee for that week. Thereafter, defendant instructed the employees where and when to turn in their timesheets so that they would be paid appropriately. Defendant testified that she only came to the jobsite to bring food and to make sure the men were not sleeping on the job.
11. Plaintiff began work for defendant in September of 2006. Robbie Suggs, Herbert Brandon, Eddie Bingham, David Brandon, Joshua Moose, Earl Bradley, and Wayne Bradley also worked for defendant. All of these persons were employed on an hourly basis. They also prepared time sheets for work performed. Defendant instructed her employees to submit their timesheets in a mailbox at 112 Seventh Avenue in Cramerton.
12. David Brandon lives in Mount Holly, North Carolina. Mr. Brandon has worked in construction and has experience in framing, roofing, and deck construction. Mr. Brandon testified *Page 6 
that he knew plaintiff and worked with plaintiff for defendant in November of 2006. Mr. Brandon earned an hourly rate of $10 per hour and worked on a full time basis. Mr. Brandon regularly submitted his timesheets to defendant. Mr. Brandon understood that his employer was defendant, Diane Watkins. Mr. Brandon testified that defendant came to the jobsite and inspected the work at least once per day. Mr. Brandon was not responsible for providing any tools or supplies.
13. Earl Bradley, Jr., lives in Gastonia, North Carolina. Mr. Bradley has prior experience in construction. Mr. Bradley knows plaintiff because they worked together for defendant. Mr. Bradley, plaintiff, and David Brandon all worked together. Mr. Bradley worked from August 2006 through November 2006. Mr. Bradley submitted his timesheet regularly to defendant for pay. Defendant always paid Mr. Bradley on Fridays. Mr. Bradley worked eight (8) hours per day on a full time basis. Like plaintiff and Mr. Brandon, Mr. Bradley was not required to furnish tools or supplies or materials.
14. Donald Curtis Martin performed framing, trim work, cabinetry, and exterior work for defendant. He could not tell whether Mr. Bingham hired his own help. According to Mr. Martin, defendant does not have any employees. Mr. Martin had a compensation arrangement with defendant in which he was paid both for piecework as well as hourly work. Mr. Martin testified that plaintiff, Mr. Bradley, and Mr. Brandon, were paid strictly by the hour pursuant to the time sheets.
15. During the time period of November and December, 2006, Mr. Martin had his own company. While performing work for defendant, Mr. Martin began employment with Zepsa Industries in Charlotte. Mr. Martin brought members of his own company to perform work on the houses owned by defendant; however, they were paid through his company. *Page 7 
16. On or about November 25, 2006, plaintiff and his co-workers built a deck for defendant. Defendant had the deck inspected and it did not pass inspection and needed to be redone. Defendant had the workers pull it off and start over again. Plaintiff and his co-workers were setting a girder A brace across the bottom of the deck into a notch. Plaintiff testified that he was holding the end of the girder when it hit the top of his head and bounced off onto his shoulder. Plaintiff testified he was stunned but unaware of the damage it had caused to his neck.
17. Two days later, plaintiff was unable to move his arm or pick anything up. Plaintiff presented to the emergency room at Gaston Memorial Hospital. Plaintiff was given medication, an injection and referred to a specialist. The triage record of November 28, 2006, documented that plaintiff complained of pain in the right shoulder, neck and chest, and that plaintiff had experienced such pain for one week. The attending physician noted that plaintiff presented with atypical chest pain, most likely secondary to some type of radiculopathy in his neck.
18. Later, plaintiff presented to Dr. Herman Gore and received epidural injections. Since that time, plaintiff became financially unable to continue specialized treatment as he did not have health insurance. Plaintiff eventually sought treatment with a primary care provider that would accept cash payments.
19. Plaintiff underwent an MRI of his neck, shoulder, and arm. The results of the MRI revealed that plaintiff sustained three herniated discs and one torn disc with a pinched nerve at L4-5 producing radicular pain through his arms.
20. Plaintiff presented to Dr. Herman Gore of Carolina Spine, Pain and Rehabilitation on March 30, 2007, following a referral by Dr. Thomas Calogero. Plaintiff informed Dr. Gore that he worked in construction and was at Cramer Mountain fixing a house when one of the frames hit him on the top of his head. Plaintiff noted that since this incident he had experienced *Page 8 
severe pain in his neck. Following a physical examination and a review of the MRI results, Dr. Gore diagnosed plaintiff with cervical disc herniation with encroachment of the anterior thecal sac; cervical radicular pain, and painful muscle spasm/myofascial pain. Dr. Gore ordered a neuromuscular stimulator/TENS unit to help retard the pain as well as recommended a physical therapy program and an anti-inflammatory medication.
21. Subsequently, plaintiff presented to Dr. Barro. Dr. Barro placed plaintiff out of work and prescribed medications. Plaintiff began physical therapy, but Dr. Barro informed plaintiff that he needed to consult with a pain specialist before completion of the physical therapy program.
22. Plaintiff presented to Gaston Primary Care on April 1, 2008, complaining of neck, upper back, and shoulder pain over the previous 17 months. Plaintiff was diagnosed with neck and right upper extremity pain due to cervical radiculopathy, and muscle wasting of the right upper extremity. The examining physician determined that he needed a neurological referral, but plaintiff declined because of his inability to pay. Accordingly, plaintiff was prescribed Metformin for his diabetes, and Percocet by Dr. A. Charles Akhimieni. Plaintiff was taken out of work due to severe problems with his neck and right upper extremity.
23. Plaintiff returned to Gaston Primary Care on May 1, 2008, with continued complaints of upper back pain as well as neck pain. He was advised to continue with Zanaflex and an increased dosage of Percocet.
24. Plaintiff's last visit with Dr. Achtman at Gaston Primary Care was February 4, 2010. Plaintiff has continued to suffer chronic pain.
25. Defendant testified that she was never informed of plaintiff's alleged injury occurring on November 25, 2006. Defendant stated that the first time she became aware of the *Page 9 
alleged injury was about one and one-half years later when she received paperwork by mail indicating that plaintiff had filed for workers' compensation coverage.
26. Defendant testified that plaintiff did not return to work after November of 2006 because of plaintiff's diabetes.
27. Defendant never asked Eddie Bingham to produce proof of workers' compensation insurance to cover the people who worked with him.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In the construction work on the house at 112 Seventh Avenue, Cramerton, North Carolina, defendant Diane Watkins was the owner/builder, and was neither a principal contractor nor a sub-contractor, as those terms are used in N.C. Gen. Stat. § 97-19. N.C. Gen. Stat. § 97-19.
2. At the time of plaintiff's November 25, 2006 work injury, defendant was not a statutory employer pursuant to N.C. Gen. Stat. § 97-19, because defendant was not acting as a principal contractor, intermediate contractor, or subcontractor, but rather, was acting as the owner/builder of the property.Purser v. Heatherlin Properties,137 N.C. App. 332, 527 S.E.2d 689, rev. denied,352 N.C. 676, 545 S.E.2d 428 (2000); Mayhew v. Howell,102 N.C. App. 269, 401 S.E.2d 831, affirmed per curiam,330 N.C. 113, 408 S.E.2d 853 (1991).
3. In holding that the owner/builder in Mayhew was not a statutory employer pursuant to N.C. Gen. Stat. § 97-19 of the North Carolina Workers' Compensation Act, the North Carolina Court of Appeals quoted Evans v. Tabor City Lumber Co., wherein the North Carolina Supreme Court noted: *Page 10 
 [t]he logic of the Industrial Commission in concluding that there can be no sub-contractor without an original contractor is unimpeachable; and by "original contractor" is meant one who has undertaken for another to do something, the performance of which he has in whole or in part sublet to another. It would be unreasonable to assume that a person could contract with himself to do something for his own benefit so as to answer the definition of original contractor if he should contract the performance of that operation to another person or concern. Id., at 273, 401 S.E.2d at 834, affirmed per curiam, 330 N.C. 113, 408 S.E.2d 853 (1991), quoting, Evans v. Tabor City Lumber Co., 232 N.C. 111, 117, 59 S.E.2d 612, 616 (1952).
4. In the present case, the competent, credible evidence of record is clear that defendant undertook to hire plaintiff for her own benefit. By definition, this means the work performed at the house on 112 Seventh Avenue by plaintiff could not have been "undertaken for another," and so the hiring of plaintiff to work on the house could not have been "sublet to another . . . so as to answer the definition of original contractor . . ." Id. This engagement is nothing more than the owner of real property hiring the services of an independent contractor to make improvements upon such real property.
5. With respect to employers subject to the North Carolina Workers' Compensation Act who do not have workers' compensation insurance coverage, the Act provides that:
 Any employer required to secure the payment of compensation who refuses or neglects to secure such compensation shall be punished by a penalty of one dollar ($1.00) for each employee, but not less than fifty dollars ($50.00) nor more than one hundred dollars ($100.00) for each day of such refusal or neglect, and until the same ceases. . . . Any person who, with the ability and authority to bring an employer in compliance with N.C. Gen. Stat. § 97-93, willfully fails to bring the employer in compliance, shall be guilty of a Class H felony. Any person who, with the ability and authority to bring an employer in compliance with N.C. Gen. Stat. § 97-93, neglects to bring the employer in compliance, shall be guilty of a Class 1 misdemeanor. Any person who violates this subsection may be assessed a civil penalty by the Commission in an amount up to one hundred percent (100%) of the amount of any compensation *Page 11 
due the employers' employees injured during the time the employer failed to comply with N.C. Gen. Stat. § 97-93.
N.C. Gen. Stat. §§ 97-94(b) and 97-94(d).
6. In this case, there is no evidence that any party to North Carolina Industrial Commission file number PH-1959 was subject to the requirement to have workers' compensation insurance coverage. Therefore, no penalties are assessed in this matter.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 ORDER
1. Under the law plaintiff's claim must be, and is hereby, DENIED.
2. There is no evidence that any party to North Carolina Industrial Commission file number PH-1959 was subject to the requirement to have workers' compensation insurance coverage. Therefore, no penalties are assessed in this matter.
3. Each side shall bear its own costs.
This the 27th day of April, 2011.
 S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 1